**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

ALLENTOWN VICTORY CHURCH      :
a Pennsylvania not for profit corporation,  :
        Plaintiff,             :
                                :
            v.                :     Civil No. 5:21-cv-03021-JMG
                                :
CITY OF ALLENTOWN, PENNSYLVANIA  :
a Pennsylvania municipal corporation, _et al._,  :
        Defendants.        :

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                          **September 1, 2022**

      Plaintiff Allentown Victory Church requested a zoning variance to run a drug and alcohol recovery facility in a residential district of Allentown, Pennsylvania. Allentown's Zoning Hearing Board denied the request, which prompted this suit. Allentown Victory Church now asserts that Allentown's decision violated the Fair Housing Act, the Americans with Disabilities Act, and the Religious Land Use and Institutionalized Persons Act. Before the Court is Allentown's Motion for Summary Judgment. For the reasons that follow, the Court grants the Motion in full.

**I.      FACTUAL BACKGROUND[1]**

      Plaintiff Allentown Victory Church ("AVC") is a non-denominational non-profit church. Defs.' Statement of Undisputed Facts ¶ 1, ECF No. 31 [hereinafter "DSOF"]; Pl.'s Statement of Material Facts ¶ 1, ECF No. 35 [hereinafter "PSOF"]. AVC operates the Recover Victory Home ("RVH"), an all-male, Christian facility for individuals recovering from drug and alcohol addiction. DSOF ¶¶ 5–6; PSOF ¶¶ 5–6. Throughout their stay at RVH, residents attend religious

---

[1]     The parties filed a Joint Appendix of exhibits. _See_ ECF No. 31-2. The Court references the materials included in the Joint Appendix as "J.A."

services as well as Alcoholics Anonymous or Narcotics Anonymous meetings.  DSOF ¶¶ 7–10; PSOF ¶¶ 7–10.

RVH is located in an area of Allentown, Pennsylvania that is zoned for residential use.  *See* J.A. 34.  Upon application and approval for a special exception, "Group Homes" are permitted within that zoning classification.  DSOF ¶ 19; PSOF ¶ 19; *see also* J.A. 321, 339, 369.  Allentown defines "Group Home" in Article 1303 of its Codified Ordinances as:

> residential clients and attendant (24 hours or less) staff, living together in a dwelling unit and functioning as a single housekeeping unit under a common housekeeping management plan based upon an intentionally structured relationship providing organization and stability.  The resident clients of a group home must be limited to persons who need specialized housing because of age, disability or illness, and may include, but not necessarily limited to children, the mentally or physically handicapped and elderly, but shall not include drug and alcohol rehabilitation facilities, or adult prerelease correctional facilities such as work release, halfway houses or similar uses.

J.A. 332.  As relevant here, a "Large Group Home" houses "seven or more resident clients, up to a maximum of 12 resident clients."  J.A. 333.

Allentown's Codified Ordinances also contemplate "Institutions or Residences for Children, the Aged, or the Handicapped."  J.A. 334.  Allentown defines "Institution or Residence for Children, the Aged, or the Handicapped" as:

> a group residential facility that provides supportive services and treatment as well as residence or more than 12 unrelated persons including but not limited to children, juvenile delinquents, the mentally or physically handicapped and elderly, but not including drug and alcohol treatment or rehabilitation facilities, or adult pre-release correctional facilities such as work release, halfway houses or similar uses.

*Id.*  Applicants must secure a zoning variance—and not a special exception—before operating such facilities in the area in which RVH is located.  J.A. 322, 349, 383.  To obtain a variance, an applicant must show, among other requirements, that "the provisions of the Zoning Ordinance

inflict unnecessary hardship." J.A. 349.

On April 12, 2019, Allentown issued a Notice of Violation concerning RVH. J.A. 34. The Notice described RVH as a "Drug and Alcohol Rehabilitation Facility"[2] that was operating without the requisite permit. *Id.* Allentown ordered AVC "to cease and desist operating the drug and alcohol rehabilitation facility or file an appeal to the Zoning Hearing Board within thirty (30) days." *Id.*

AVC filed an appeal with Allentown's Zoning Hearing Board (the "Board"). J.A. 36. As part of that appeal, AVC requested that RVH be treated as a "Large Group Home." J.A. 38. It also requested permission to house eighteen, as opposed to twelve, residents. *Id.* In so doing, AVC invoked Article 1307.03C of the Codified Ordinances, which allows for modifications to specific zoning requirements if "necessary to provide a 'reasonable accommodation' required by the Americans with Disabilities Act and/or the Federal Fair Housing Act." J.A. 350.

After appearing before the Board on June 10, 2019, AVC withdrew its appeal and instead applied for a variance to classify RVH as an "Institution or Residence for Children, the Aged, or the Handicapped." *See* J.A. 51, 504. In the alternative, AVC reapplied for consideration as a "Large Group Home." *See* J.A. 76, 504.

AVC again appeared before the Board on August 26, 2019. DSOF ¶ 32; PSOF ¶ 32. As before, AVC requested permission to house more than twelve residents by citing Article 1307.03C's "reasonable accommodation" provision. *See, e.g.*, J.A. 75. This time, however, AVC asked for permission to house fifteen, as opposed to eighteen, residents. *See* J.A. 68.

---

[2]     The Zoning Ordinances define "Drug and Alcohol Rehabilitation Facility" as: "a facility which provides residentially based treatment and rehabilitation and/or out-patient services. The residentially based facility may include room and board, personal care, and intensive supervision and case work for no more than 30 patients. Both the residential and out-patient facilities may be included within a hospital, but are not a hospital or clinic as defined in this Ordinance. The foregoing definition shall not be deemed to include a Veterans Treatment Center as defined in this Ordinance and any references in this Ordinance to a drug and alcohol rehabilitation facility shall not include any such Veterans Treatment Center." J.A. 330.

At the hearing, AVC's attorney answered questions from the Board and presented Matthew Catricola, AVC's pastor, as a witness.  J.A. 65–70.  Four community residents testified in opposition to AVC's requests.  J.A. 70–76.

At the conclusion of the hearing, the Board denied AVC's request to operate as a "Large Group Home" for eighteen residents, as well as its request for a variance as an "Institution or Residence for Children, the Aged, or the Handicapped."  J.A. 79.

About one month later, the Board issued a written opinion in support of its decision.  J.A. 95–99.  As to RVH's proposed use as an "Institution or Residence for Children, the Aged, or the Handicapped," the Board concluded that AVC had "not met its burden" of showing unnecessary hardship.  J.A. 97.  To that end, the Board noted that "no evidence was presented to indicate that there is no possibility [RVH] can be used in strict conformance with the provisions of the Zoning Ordinance."  *Id.*  The Board also concluded that RVH "is or is similar to" a halfway house.  J.A. 98.  It emphasized that RVH mandates "attendance at Sunday church services at [AVC], three meetings per week of bible study or prayer services, four meetings per week with a sponsor regarding its 12 Step program, one meeting for one hour per week with a certified recovery specialist and supervision in the community at large."  *Id.*  Such requirements, the Board reasoned, fall within "the province of halfway houses."  *Id.*  And because halfway houses are excluded from the definition of "Group Homes," the Board denied AVC's request that RVH be treated as a "Large Group Home."  *Id.*

Notwithstanding the Board's decision, in October 2019, AVC entered a new lease for RVH through 2024.[3]  J.A. 100–11.

---

[3]     At oral argument, Plaintiff's counsel confirmed that RVH continues to operate to this day.

## II.     PROCEDURAL HISTORY

Plaintiff filed a Complaint with this Court on July 8, 2021, *see* Compl., ECF No. 1, to which Defendants responded on September 20, 2021, *see* Answer, ECF No. 14.  On July 8, 2022, Defendants filed the present Motion.  *See* Defs.' Mot., ECF No. 32.  Both parties submitted additional briefing thereafter.  *See* Pl.'s Mem., ECF No. 44; Defs.' Reply, ECF No. 40; Pl.'s Sur-Reply, ECF No. 53.  The Court heard oral argument on August 18, 2022, *see* ECF No. 57, and the Motion is now ripe for disposition.

## III.    STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Facts are material if they "might affect the outcome of the suit under the governing law."  *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).  "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

## IV. DISCUSSION

AVC brings discrimination claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*  In short, it challenges Allentown's enforcement of its Zoning Ordinances, alleging that the city has "engaged in a pattern and practice of conduct with the intent, purpose, and/or effect of discriminating against persons with handicaps or disabilities."  Compl. 1.

AVC's claims overlap in many respects.  The Court therefore addresses the FHA and ADA claims together before turning to the RLUIPA claim.

### A. FHA and ADA

The FHA "prohibits housing discrimination on the basis of, *inter alia*, race, gender, and national origin—and, following the adoption of the [Fair Housing Amendments Act] in 1988, individuals with disabilities." *431 E. Palisade Ave. Real Estate, LLC v. City of Englewood*, 977 F.3d 277, 283 (3d Cir. 2020) (internal quotation marks omitted).  The ADA similarly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "This statement constitutes a general prohibition against discrimination by public entities, regardless of activity." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007) (citation omitted); *see also Sunlight of Spirit House, Inc. v. Borough of N. Wales, Pa.*, No. 16-cv-909, 2019 WL 233883, at *10 n.2 (E.D. Pa. Jan. 15, 2019) (recognizing that the ADA "applies to zoning

decisions").

"The FHA and the ADA's requirements are 'essentially the same,' allowing courts to apply the FHA analysis to ADA claims." *Oxford House, Inc. v. Twp. of N. Bergen*, No. 21-19260, 2022 WL 2341630, at *3 (D.N.J. June 29, 2022) (quoting *Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 914 (D.N.J. 2019)); *see also Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 521 n.2 (W.D. Pa. 2007). Indeed, "[s]tatutory claims brought against zoning authorities under the FHA . . . and the ADA may proceed under a 'disparate treatment,' 'disparate impact' or 'reasonable accommodation' theory." *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 823 (W.D. Pa. 2010) (citing *Sharpvisions*, 475 F. Supp. 2d at 522).

AVC proceeds under all three theories. *See, e.g.*, Compl. ¶ 126. The Court considers them in turn.[4, 5]

    1.   <u>Disparate Treatment</u>

"Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action." *431 E. Palisade Ave.*, 977 F.3d at 284 (quoting *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005)). "The discriminatory purpose need not be malicious or invidious, nor need it figure in solely, primarily, or even predominantly into the motivation behind the challenged action." *Wind Gap*, 421 F.3d at 177 (internal quotation marks and citation omitted). Instead, a plaintiff need only "show that a protected characteristic played a role in the defendant's decision

---

[4]    "As a predicate to success on any of these claims, a plaintiff must present a class of protected individuals, i.e. handicapped individuals." *Hansen Found., Inc. v. City of Atlantic City*, 504 F. Supp. 3d 327, 335 (D.N.J. 2020) (internal quotation marks and citation omitted). Allentown does not dispute this element. After all, "[c]ourts in this Circuit have held that drug and alcohol addiction qualify as a handicap under these statutes." *Id.* (citation omitted).

[5]    These analyses proceed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Griffin v. Miller*, 648 F. App'x 182, 183 (3d Cir. 2016) (noting that the "District Court properly concluded" that plaintiff's FHA claims "are governed by . . . *McDonnell Douglas*"). Under that framework, AVC must first make out a prima facie case of discrimination.

to treat her differently." *Id.* (internal quotation marks and citation omitted).

"In evaluating a defendant's motion for summary judgment on a disparate treatment claim, a court's task is to determine whether, upon viewing all of the facts and reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the [defendant] intentionally discriminated against the plaintiff." *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 902 (E.D. Pa. 2017) (internal quotation marks and citation omitted); *see also Meraki Recovery Housing, LLC v. City of Coon Rapids, Minn.*, No. 20-cv-0203, 2021 WL 5567898, at *5 (D. Minn. Nov. 29, 2021) ("Determining whether a municipality's zoning decision was tainted by discriminatory intent 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

AVC's disparate treatment claim is twofold:[6] first, it suggests that the "Institution or Residence for Children, the Aged, or the Handicapped" classification is facially discriminatory. Compl. ¶ 138(d) (requesting that the Court declare the "'Institution for Children, the Aged or Handicapped' ordinance to be facially discriminatory and in violation of the FHA and ADA"); Pl.'s Sur-Reply 6 ("Zoning laws that use discriminatory classifications (i.e., 'discriminate on their face') violate the FHA."). Second, it argues that "the disability of the residents of the dwelling . . . provided by AVC was a motivating factor in the denial of its variance application." Pl.'s Mem. 15.

The Court begins with AVC's facial discrimination claim. Allegations of facially

---

[6]     The bifurcated nature of AVC's disparate treatment claim is not uncommon, as "[a] plaintiff can prove disparate treatment *in one of two ways*: through direct or circumstantial evidence of discriminatory animus; *or* by asserting that a facially discriminatory classification violates the FHAA." *Cornerstone Residence, Inc. v. City of Clairton, Pa.*, No. 17-706, 2017 WL 5171189, at *9 (W.D. Pa. Nov. 8, 2017) (emphasis added) (citation omitted).

discriminatory zoning classifications are, as opposed to as-applied claims of discrimination, subject to a lessened burden: "where a plaintiff demonstrates that that the challenged action involves disparate treatment through explicit facial discrimination, or a facially discriminatory classification, a plaintiff *need not prove* the malice or discriminatory animus of a defendant, because the focus is on the explicit terms of the discrimination." *Hansen Found.*, 504 F. Supp. 3d at 336 (emphasis added) (internal quotation marks and citation omitted).  "Put another way, direct evidence of intent is supplied by the policy itself." *431 E. Palisade Ave.*, 977 F.3d at 284 (internal quotation marks and citation omitted).

The crux of AVC's facial challenge is that, in residential districts, "Institutions or Residences for Children, the Aged, or the Handicapped" require a variance, while "[o]ther living arrangements for the disabled," like large group homes, halfway houses, and drug and alcohol rehabilitation facilities, merely require a special exception.  *See* Pl.'s Sur-Reply 5; *see also* J.A. 382–83.  *Compare* J.A. 351 (describing special exception procedures), *with* J.A. 349 (describing variance procedures).  "The requirement of a variance," AVC asserts, "is an onerous burden not imposed on the other disabled housing classifications and constitutes intentional discrimination." Pl.'s Sur-Reply 5.

"The touchstone of explicit facial discrimination is that the discrimination is apparent from the terms of the policy itself."  *DiBiase v. SmithKline Beech Corp.*, 48 F.3d 719, 727 (3d Cir. 1995); *see also Wind Gap*, 421 F.3d at 179 ("[W]e must examine the language of the challenged regulation or policy, aided, if applicable, by any evidence of record that informs the analysis."). Here, the definition of "Institutions or Residences for Children, the Aged, or the Handicapped" is based, at least in part, on disability.  Indeed, these residences are defined as "group residential facilit[ies] that provide[] supportive services and treatment as well as residence [for] more than 12

unrelated persons including but not limited to children, juvenile delinquents, *the mentally ill or physically handicapped and elderly*, but not including drug and alcohol treatment or rehabilitation facilities, or adult pre-release correctional facilities."  J.A. 334 (emphasis added).

But an ordinance is not facially discriminatory just because it references disabled individuals.  *Cf. Get Back Up, Inc. v. City of Detroit*, No. 11-13909, 2013 WL 3305672, at *4 n.3 (E.D. Mich. July 1, 2013) (rejecting argument "that an ordinance discriminates on its face if it explicitly identifies and regulates a substance-abuse treatment center").  Instead, "[a]n ordinance facially discriminates against the handicapped where it singles them out and applies different rules to them." *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1349 (S.D. Fla. 2007).

By way of example, consider *Rehabilitation Support Services, Inc. v. City of Albany, New York*, No. 1:14-cv-0499, 2017 WL 3251597 (N.D.N.Y. July 28, 2017).  At issue there was a provision of Albany's zoning code that defined a "community residence" as: "A residence for a disabled population . . . providing a homelike environment and/or supervision for the housing and care of no more than 14 disabled persons within a setting that is integrated within the community." *Id.* at *2.  Such "community residences" were not permitted as of right in certain residential zones. *Id.*  Rather, "[a] person seeking to build a community residence in [that] zone must obtain a use variance." *Id.*  Apartment buildings and rooming houses also required a use variance in the same residential zones. *Id.*  "On the other hand, private schools, nursing homes, day-care centers, colleges or universities, dormitories, bed-and-breakfasts, charitable or religious organizations, and satellite dish antennas" were permitted in these zones with just a special use permit. *Id.*

The *Albany* plaintiff, who sought to operate residences "for people recovering from alcoholism or substance abuse," argued that Albany's zoning ordinance was facially discriminatory because it "prohibits community residences for people with disabilities in a

residential zone."  *Id.* at *1, 4 (internal quotation marks omitted); *see also id.* at *6 ("[Plaintiff] claims that the City's ordinance is facially discriminatory because it defines community residences as homes for the disabled and bars them from the [residential] zone unless they go through the allegedly onerous process of obtaining a use variance.").[7]

The court rejected the argument and found that Albany's zoning ordinance did not discriminate on its face.  Its conclusion stemmed from the principle that, "[f]or a facially discriminatory policy, a plaintiff makes out a prima facie case of intentional discrimination under the [FHA] . . . by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment compared to others who are *similarly situated*."  *Id.* at *4 (emphasis in original) (internal quotation marks and citations omitted).  The *Albany* plaintiff fell short because it did not show that "community residences" were similarly situated to other uses that were either permitted as of right or allowed by special permit in residential districts:

> [Plaintiff] has failed to provide any reasons why the Court should find community residences comparable to the uses allowed as of right or by special permit in the City's [residential] zone.  Thus, [plaintiff] has not presented evidence that would allow a reasonable jury to find that the zoning ordinance it challenges is facially discriminatory.

*Id.* at *6.

Allentown's zoning scheme resembles Albany's.  Mirroring Albany's treatment of community residences, Allentown requires that "Institutions or Residences for Children, the Aged, or the Handicapped" secure a variance before operating in certain residential districts.  Like Albany, other uses, such as boarding houses, are also forbidden in these districts without a

---

[7]      *Compare* Pl.'s Sur-Reply 5 ("The requirement of a variance is an onerous burden . . . .").

variance.[8]  In that vein, the burdens imposed on RVH are "shared."  *Id.* at *6.  And like the plaintiff in *Albany*, RVH has not shown how it is similarly situated to property uses that are permitted either as of right or by special exception in residential districts.  RVH's failure in that regard precludes "a prima facie case of intentional discrimination or disparate treatment."  *Id.*

     *Get Back Up, Inc. v. City of Detroit* offers similar guidance.  That case concerned Detroit's zoning ordinance and the property uses permitted in "General Business Districts."  *Get Back*, 2013 WL 3305672, at *1.  More specifically, a host of commercial properties were permitted "as of right" in those districts.  *Id.*  Other uses—including "residential substance-abuse service facilities"—required a permit to operate in those districts.  *Id.*  Plaintiff, who sought to operate a building as a substance-abuse service facility, claimed that "the distinction between 'by-right' uses and [uses requiring a permit] violates federal law."  *Id.* at *5.

     The court rejected that argument, and the Sixth Circuit affirmed.  *See Get Back Up, Inc. v. City of Detroit*, 606 F. App'x 792 (6th Cir. 2015).  The Sixth Circuit held that "the ordinance does not discriminate by requiring [plaintiff] to obtain a conditional use permit."  *Id.* at 796.  It emphasized that residential substance-abuse service facilities "are treated the same as many other residential uses."  *Id.*  "Residential substance abuse facilities are allowed to operate in . . . business districts if they obtain a conditional use permit.  The same is true for a multi-family dwelling, an emergency shelter, [and] a rooming house."  *Id.*  In sum, because plaintiff failed to show any "materially similar uses that may operate by right in a [business] zoning district, the ordinance is not facially discriminatory."  *Id.* at 797.

---

[8]     Allentown defines a "Boarding House" as "a building where lodging is provided with or without meals for 3 or more persons as their primary residence who are not members of the operator's family, and for compensation, whether direct or indirect.  This term shall not include lawful dwelling units that are each occupied by one 'family,' nor shall it include nursing homes or personal care centers; fraternities; sororities; or dormitories."  J.A. 338.

     By way of further example, dormitories and veterans treatment centers are also forbidden in residential districts without a variance.  J.A. 382–83.

The Sixth Circuit also distinguished plaintiff's claim from cases involving "outright bans" of facilities housing the disabled, as well as cases with "direct evidence of discriminatory intent." *Id.*

Like *Get Back*, this case does not involve an outright ban, nor has AVC presented direct evidence of discriminatory intent, like statements of "generalized prejudice" by the relevant decisionmakers. *See New Directions*, 490 F.3d at 307. And like the *Get Back* plaintiff, AVC has not provided any evidence to show that its recovery facility is "materially similar" to any other property uses, let alone those permitted by right or by special exception in residential zones. *Get Back*, 606 F. App'x at 797.

Allentown's zoning scheme, therefore, does not facially discriminate. To be sure, this is not a case where a zoning ordinance imposes burdens unique to disabled residents. *See, e.g.*, *Human Res. Research & Mgmt. Grp. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 254 (E.D.N.Y. 2010) ("[I]t is undisputed that [the ordinance] is discriminatory on its face, in that it imposes restrictions and limitations *solely* upon a class of disabled individuals – people who are seeking treatment to recover from drug and alcohol addiction – *that are not generally imposed on others seeking to live in Suffolk County*." (emphasis added)); *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 355 (E.D. Pa. 2020) ("The ordinance *singles out* methadone clinics for different zoning procedures such that it is facially discriminatory under the ADA . . . ." (emphasis added) (internal quotation marks and citation omitted)).

Beyond a claim of facial discrimination, AVC also argues that "the disability of the residents of the dwelling . . . provided by AVC was a motivating factor in the denial of its variance application." Pl.'s Mem. 15.

This argument is also unavailing. AVC claims, in conclusory fashion, that "the words and

actions of the [Board] members" show discriminatory animus.  Pl.'s Sur-Reply 6.  It also argues that the Board members misapplied—and lacked sufficient knowledge of—the FHA and ADA.  *See* Pl.'s Mem. 20 ("[T]he [Board's] outlandish misstatements of the law can only be characterized as deliberative indifference.  The [Board] has intentionally discriminated against AVC through its deliberative indifference to its ADA rights.").  But this "deliberate indifference" argument is made without citation to relevant case law.[9]  As it stands, AVC presents "nothing more than unsupported assertions to support" its allegations of discriminatory animus.  *Cf. Oxford Invs., L.P. v. City of Phila.*, 21 F. Supp. 3d 442, 457 (E.D. Pa. 2014).  Its claims of disparate treatment must be dismissed.

2.    Disparate Impact

"In order to make out a prima facie case of disparate impact under the FHAA, the plaintiff must show that [Allentown's] action had a greater adverse impact on the protected group . . . than on others."  *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466–67 (3d Cir. 2002) (citation omitted).  Stated differently, "[t]he plaintiff must first make out a prima facie case of disparate impact by showing that the defendant's action 'disproportionately burdened a particular [protected] group so as to cause a disparate impact.'"  *Fair Hous. Rights Ctr. v. Morgan Props. Mgmt. Co., LLC*, No. 16-4677, 2018 WL 3208159, at *10 (E.D. Pa. June 29, 2018) (quoting *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 382–83 (3d Cir. 2011)).   "Although statistics are most often used to demonstrate the disproportionate burden, a plaintiff must simply offer proof of that impact in a plausibly measured way."  *Id.* (citation omitted).

AVC argues that the definition of "Institution or Residence for Children, the Aged, or the

---

[9]     AVC cites no cases that apply the deliberate indifference doctrine to zoning decisions.

Handicapped," J.A. 334, results in discrimination.[10]  Pl.'s Sur-Reply 7.  Whereas such institutions

are capped at twelve residents, the argument goes, "the City's zoning code allows for groups of up

to 30 persons for other zoning classifications."  *Id.*  The fact that institutionalized persons, "and

not . . . others," must apply for a variance to reside with more than twelve people "has a

discriminatory impact on AVC with the end result that it makes housing unavailable for . . .

disabled persons."  *Id.* at 7–8.

   The District of Colorado encountered a similar argument in *Green v. El Paso County,*

*Colorado*, No. 18-cv-1122-WJM-KMT, 2020 WL 4429387 (D. Colo. July 31, 2020).  There, the

relevant zoning ordinances permitted group homes with five or fewer occupants in single family

residential districts.  *Id.* at *3.  "Group Homes with six to ten occupants require[d] a Special Use

Permit."  *Id.*  Plaintiffs, operators of substance abuse rehabilitation facilities, argued that the

defendant-county "caused a disparate impact on handicapped or disabled persons when it [p]laced

an arbitrary occupancy limit of five (5) persons on group homes for protected persons."  *Id.* at *13

(internal quotation marks omitted).  The Court rejected this argument, emphasizing that plaintiffs

produced no evidence "supporting the actual number of residents that [they] could accommodate,

or evidence that the County has *ever* denied a Group Home's application for a Special Use Permit."

*Id.* at *14 (emphasis in original).  "Because Plaintiffs . . . failed to provide any evidence that the

County's zoning ordinances had a significant disparate effect on recovering addicts," the Court

granted summary judgment to the defendant-county for any claims "relying on this theory of

disparate impact."  *Id.*

---

[10]  AVC only addresses disparate impact discrimination in its sur-reply.  The decision to consider "contentions first addressed in [a] sur reply memorandum" lies solely within the Court's sound discretion.  *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020) (internal quotation marks and citation omitted).  Nevertheless, because the Court directed AVC's supplemental briefing, *see* Order, ECF No. 43, AVC's arguments will be considered in full.

AVC's claim is equally devoid of any supporting evidence.  For instance, AVC argues, without citation to the record, that the "zoning scheme enforced by the [Board] predictably resulted in discrimination."  Pl.'s Sur-Reply 7.  Similarly unsupported is AVC's assertion that the Board's conduct has made "housing unavailable for . . . disabled persons."  *Id.* at 8; *see, e.g.*, *Oxford House, Inc.*, 2022 WL 2341630, at *5 ("Plaintiff provides no evidence—statistical or otherwise—to support the notion that Defendant's decision had a greater adverse impact on a protected group, and instead rests on mere speculation.").

As a result, AVC's claim for disparate impact discrimination cannot withstand summary judgment.  *Cf. Oxford Invs.*, 21 F. Supp. 3d at 457 (entering summary judgment for defendants where plaintiff "offers nothing more than unsupported assertions to support its disparate impact claims").

### 3.    Reasonable Accommodation

Discrimination under the FHA also includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

"[T]o succeed on a reasonable accommodations claim, a plaintiff must show that the requested accommodation was '(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'"  *Oxford Invs.*, 21 F. Supp. 3d at 457 (quoting *Lapid-Laurel*, 284 F.3d at 457).  A "plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling."  *Lapid-Laurel*, 284 F.3d at 457.  "Only after a plaintiff makes this showing does the burden shift, and a defendant is required to demonstrate that the requested accommodation is

unreasonable." *Oxford Invs.*, 21 F. Supp. 3d at 458 (citation omitted). "Therefore, in order to evaluate a motion for summary judgment on a reasonable accommodations claim, a court must determine whether there is a genuine issue of material fact regarding: (1) whether the accommodations that [the plaintiff] requested were necessary to afford handicapped persons an equal opportunity to use and enjoy housing; and, if so (2) whether the accommodations requested were unreasonable." *Fair Hous. Rights Ctr.*, 2018 WL 3208159, at *6 (internal quotation marks and citation omitted).

At issue here is "AVC's accommodation request to waive the maximum number of residents for a group home above 12 residents." Pl.'s Mem. 10–11. Such an accommodation, it is averred, would make RVH "financially viable." *Id.* at 12.

"In a zoning case, to establish necessity, the plaintiff has to show that [the requested zoning variance] is required to make the proposed facility financially viable or medically effective." *Yates*, 404 F. Supp. 3d at 918 (internal quotation marks and citation omitted). With respect to financial viability, "it is not sufficient to show that a home with more residents or units is generally beneficial or more economical to run." *Id.* at 919. Rather, "[a]n applicant must produce evidence showing why the number of units requested is necessary." *Id.* (collecting cases); *see, e.g.*, *Dr. Gertrude A. Barber Ctr., Inc. v. Peters Twp.*, 273 F. Supp. 2d 643, 652 (W.D. Pa. 2003) ("A provider of housing for the handicapped may establish the necessity of a requested accommodation through evidence that it must maintain a certain minimum level of occupancy for its own financial viability." (citation omitted)).

For example, in *Dr. Gertrude A. Barber Center, Inc. v. Peters Township*, the plaintiff successfully showed the necessity of having four, and not three, residents in its group home. 273 F. Supp. 2d at 652–53. Indeed, plaintiff's group home was "a particular type of state licensed and

regulated residential facility" that required at least four residents to "maintain its license and funding."  *Id.* at 645, 653; *see also ReMed Recovery Care Ctrs. v. Twp. of Willistown, Chester Cnty., Pa.*, 36 F. Supp. 2d 676, 681–82 (E.D. Pa. 1999) (finding, at the preliminary injunction stage, that group home requesting a variance for additional residents would be "financially unable to operate" without the variance).

On the other hand, in *Keys Youth Services, Inc. v. City of Olathe, Kansas*, the plaintiff failed to show the necessity of having ten, and not eight, residents in its group home.  75 F. Supp. 2d 1235, 1246–47 (D. Kan. 1999).  In proceedings before the applicable zoning authority, the plaintiff presented "no evidence . . . on which to find that the home could not operate with fewer than ten residents or that the requested accommodation [was] necessary to [the home's] financial viability."  *Id.* at 1247; *see also, e.g.*, *Oxford Invs.*, 21 F. Supp. 3d at 458 (entering summary judgment for defendants where plaintiff "entirely failed to submit record evidence to demonstrate that increasing the resident population of the Property would . . . make the Property fiscally viable"); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 605 (4th Cir. 1997) (affirming entry of summary judgment for defendant where plaintiff "introduced no evidence that group homes are not financially viable with eight," and not fifteen, residents).

In support of its accommodation request, AVC's attorney informed the Board that AVC "can't provide this kind of a facility . . . for 12 people.  It would take more than that. . . .  So, at 12, it would be economically – it would not be economically feasible to operate this type of a facility."  J.A. 49.  Pastor Catricola further testified that the "lowest common denominator" to make RVH economically viable "would be 15 people."  J.A. 67.

This mere scintilla of evidence "leaves a jury without any basis for concluding that a . . . home of [twelve] residents is not financially viable."  *Meraki Recovery*, 2021 WL 5567898, at *12.

For instance, absent from the record is any evidence that RVH requires more than twelve residents to "maintain its license and funding." *Dr. Gertrude*, 273 F. Supp. 2d at 653.  AVC not produced any sort of affidavit stating "that the continued existence of [RVH] is in jeopardy and that [AVC] has suffered losses . . . due to the restriction on the number of residents." *ReMed Recovery*, 36 F. Supp. 2d at 681; *see also Swanston v. City of Plano, Tex.*, 557 F. Supp. 3d 781, 800 (E.D. Tex. 2021) (rejecting economic necessity argument where plaintiffs "did not ultimately show [that the home's] current operating scheme . . . preclude[d] the facility from remaining financially viable").  Nor has AVC shown "that a [twelve]-person home would not be financially viable, much less provided the type of specific financial data that a jury would need to find that a [twelve]-person home was not viable." *Meraki Recovery*, 2021 WL 5567898, at *12 n.15.[11]

"An applicant must produce evidence showing why the number of units requested is necessary." *Yates*, 404 F. Supp. 3d at 919 (citation omitted).  AVC has not met that standard, so summary judgment must be granted.[12, 13]

## B.    RLUIPA

The RLUIPA provides that "[n]o government shall impose or implement a land use

---

[11]    It also bears reiterating that RVH still operates to this day.

[12]    Recall that AVC first requested a variance to house eighteen residents before requesting a variance to house fifteen residents.  And, at least as of the August 26, 2019 hearing before the Board, RVH had never housed more than eleven residents at any given time.  *See* J.A. 68.

While not dispositive, the shifting nature of the request undermines the assertion that fifteen residents are necessary to RVH's survival.  *Cf. Harmony Haus Westlake, L.L.C. v. Parkstone Prop. Owners Ass'n*, 851 F. App'x 461, 467 (5th Cir. 2021) ("[A] finding that Harmony Haus is not financially viable with six residents is not sufficient to show that 12 residents are necessary for it to be financially viable."); *Oxford House, Inc. v. City of Wilmington, N.C.*, No. 7:07-cv-61-F, 2010 WL 4484523, at *12 (E.D.N.C. Oct. 28, 2010) (entering summary judgment for defendant and recognizing that there is no "evidence that [plaintiffs' group homes] are failing or even floundering financially or therapeutically because each houses only eight and not nine, 10 or 12 men").

[13]    In the alternative, AVC claims that it was "precluded . . . from presenting evidence of [economic] necessity" before the Board.  Pl.'s Sur-Reply 4; *see also id.* at 2 ("Plaintiff was prevented from doing so . . . .").  Upon review of the administrative record, there is no indication that the Board limited AVC's ability to present evidence.

regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that the imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1).  For purposes of the RLUIPA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," including "[t]he use, building, or conversion of real property for the purpose of religious exercise."  42 U.S.C. § 2000cc-5(7).  The RLUIPA further defines a "land use regulation" as "a zoning or landmarking law . . . that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has a . . . property interest in the regulated land."  42 U.S.C. § 2000cc-5(5).

"Establishing a substantial burden requires more than merely inhibiting or constraining any religious exercise."  *First Korean Church of N.Y., Inc. v. Cheltenham Twp. Zoning Hearing Bd.*, No. 05-6389, 2012 WL 645986, at *12 (E.D. Pa. Feb. 29, 2012) (internal quotation marks and citation omitted).  Instead, a substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [similarly situated persons] versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs."  *Id.* at *13 (quoting *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)); *cf. Lighthouse Inst. for Evangelism Inc. v. City of Long Branch*, 100 F. App'x 70, 77 (3d Cir. 2004) ("[S]ubstantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."  (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342

F.3d 752, 761 (7th Cir. 2003))).

AVC's RLUIPA claim is threadbare.  AVC cites no facts to suggest that the Board's decision forced it to "choose between following the precepts of [its] religion and forfeiting benefits otherwise generally available to other [similarly situated persons]."  *Washington*, 497 F.3d at 280. Nor is there any suggestion that the Board applied "substantial pressure" on AVC to "substantially modify [its] behavior and to violate [its] beliefs."  *Id.*  Accordingly, this claim must be dismissed.[14]

## V.    CONCLUSION

RVH's mission is noble, and recovery facilities serve an essential role in society.  But, for the reasons explained above, AVC's claims of disability and religious discrimination cannot survive summary judgment.  An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[14]      AVC also notes that, because of the COVID-19 pandemic, it "has had to conduct all of its Church related activities at 1447 Hamilton Street," the address that houses RVH.  Pl.'s Mem. 23.  But this case is not about the impact that COVID has had on AVC.  The only pertinent inquiry under the RLUIPA is whether the Board's actions caused AVC "to substantially modify [its] religious behavior in violation of [its] beliefs."  *Church of Universal Love & Music v. Fayette Cnty.*, No. 06-872, 2008 WL 4006690, at *6 (W.D. Pa. Aug. 26, 2008).  It is here that AVC falls short.